The next case call for oral argument is McDaniel v. Mercy Reg. Emergency Medical System. The next case call for oral argument is McDaniel v. Mercy Reg. Emergency Medical System. May it please the Court. Counsel, my name is Michael Dolan. I represent the appellant in this case, Mercy Regional. This is an appeal from the trial court's finding that certain statements made by its employees were not in accordance with the attorney-client privilege. They were not fined $200 in order to pay attorney's fees, which are yet to be determined. The issue on appeal is relatively simple, and it's one issue, that is, whether or not the court views its discretion in finding that the statements of the employees were not cloaked with the attorney-client privilege when they were prepared at the advice of counsel and in anticipation of litigation. The facts are not extremely important, but just briefly, based upon... We have not gone through depositions of everyone, but looking at the facts in the record before you, it's clear that on October 8, 2007, the decedent, Brett McDaniel, a minor, was on a bicycle, traveling on a road, and collided with an ambulance. The ambulance was on Route 146, southbound. He had to ride away. The minor, when he was traveling towards that intersection, had a stop sign. After the collision, the driver, James Ratta, and also the passenger, Kimberly, who is both employees of the ambulance service, rendered medical assistance to the decedent at the scene. He was taken to the local hospital, and he was declared dead. In this particular case, we have the involvement of several other individuals. One is Dr. Smith. He's the medical director of Mercy. His affidavit was filed in response to the plaintiff's motion to compel production of these two statements. He was informed of the collision. He and Mr. White, who is the assistant director at Mercy, traveled to Hardin Hospital. On their way, Dr. Smith contacted their corporate attorney, Mr. Hutchinson, or Hutchins, and asked for advice. The advice that was given to him was, get written statements of these two employees. So, too, Jeremy Locke, the executive director of Mercy Regional, was calling in. He was out of the office at the time. He called in. He was told of the accident, and he also contacted the attorney, and the attorney also gave him advice, gave the statements of these particular individuals. The affidavit reflects he called for the obvious reason he was concerned of potential legal liability, which we obviously know, with the filing of the lawsuit, was a valid concern. His affidavit also reflects that Mercy provided insurance coverage for these employees on their work-related activities. Finally, we had an affidavit of Jeremy Jeffrey. He was a night supervisor. When the folks got back to Regional Mercy that evening, Rada, the driver who used the passenger, each gave type statements to him. He put them in a special envelope marked Illinois Incident Report, put them in his file cabinet where he kept those reports. They were accessible only by Mr. Locke, the director, and White, the assistant director. They were eventually given to Van Sims, who was retained by the insurance company to represent Mr. Rada, who was sued, and Mercy Regional, who was sued. James Rada's affidavit in the file reflects that it was his understanding that the type statement was going to be used for what? To help in his defense, in the defense of his employer, Mercy. Who did they give the statement to? Did they give it to the attorney, or did they give it to somebody else? They gave the statement to somebody else, and that would be Mr. Jeffrey at the advisory council. Basically, the attorney said, give a statement. So they typed out the statement, they handed it to Jeffrey. Is that the attorney that gave that advice, is it relevant that he's not representing them? No, they are employees. They are covered. The fact that Mr. Hutchins, the attorney, was not contacted directly by the employees doesn't change anything as far as legal advice. Last question here for a moment, anyway. They gave statements to the police, right? Yes, they did. And did the trial court compare the statements given to the police to the statements given to the employer? No, it did not. That's one of the things I want to discuss, but let me mention it now. The court made a finding that the statements had to be produced because why? There are three factors. Basically, these folks weren't in the control group. They were employees of the corporation. Two is they were prepared in a normal course of events, typical incident reports. And three is the attorney was not involved. Well, I think the court's wrong on those particular findings, but the fact remains that the attorney directed that the statements be repaired. That was the advice he gave, and that's the advice that was carried out. Those statements were later used by Attorney Sims, and obviously they're being used now in defending this particular case.  The best you could do. If I were to answer, just say, don't answer the question. I apologize, Judge. I want to talk about the three factors of the court. Like I mentioned, the lack of direct involvement by the attorney. He didn't talk to these individuals. The fact that the court concluded that it was a normal report and that the attorney, they were in the control group and the attorney wasn't involved. You asked, Judge, I believe, and I digress. You asked whether or not the court considered the statements of the individuals to the Illinois State Police with the statements that were given. To do that would require, what, an in-camera inspection. On page 24 and 27 of the transcripts of the hearing, that was offered to the court. The court never asked for an in-camera inspection of the statements. Why? Because the court felt not so much of what was contained in the substance of the statements, but just the way it came about, it would not be privileged. So if I wanted to delineate very simplistic terms, I would say the court's ruling was based more on a matter of procedure, how these statements were originated, as opposed to the contents, what was in those reports. Accordingly, it made its ruling without even looking at the two statements to the individuals. I don't know if it would really be any different having an in-camera inspection or affidavits. The bottom line is this, we knew that the statements described what they felt were important. The attorney advised them to write down what happened. So I don't know if that's going to be a major issue. But in any event, we look at Supreme Court Rule 201B2 that deals with privileges. It says that communication between a party and an attorney are privileged from disclosure. Why? Because you want to have frank disclosure. You want to make sure that you're not going to be worried about some disclosure to other parties when you talk to an attorney. Now, what I'd like to do today is just make a brief analysis. The briefs set forth in great detail our position, but brief analysis on what are the elements of the attorney-client privilege, what is necessary. Well, the first element is the statement has to be originated in confidence with the idea that it won't be disclosed. The second, it has to be made to an attorney for purposes of what? Obtaining advice. And third, it must remain confidential. Now, I'd like to tie in those three elements. I'll go through each one of those elements with the court's findings, and I believe you'll see that the court abuses discretion in requiring that they be disclosed. The first factor is it has to be originated in confidence with the understanding it wouldn't be disclosed. Well, the court said it while rewarding the control group. Well, that's fine. That goes to the first element. They have to originate in confidence. When you look at the case law out there, that's really dealing with the idea, is it an individual? If it's a corporation, are they within a control group? And we know what a control group is. Those are the people that make the decisions that what? Control the actions of the corporation. Now, in this particular case, there's no argument that James Ratta and Kimberly Hughes were not within the control group of Mercy Regional. However, what we're relying on is this goal minus case. The goal minus case basically carved out an exception, and it said, Even if an employee of a corporation is not within the control group, the statements are privileged if what? The employee is actually a named defendant or could be charged with liability. Let me use an analysis. If an individual is going through an intersection, runs the stop sign, collides with somebody and says, Oh, my God. Calls the attorney. What should I do? Gets advice from the attorney. There's no debate. That's going to be confidential. Now, if you follow the court's rationale, if the same attorney runs through the stop sign, hits somebody, but happens to be working for a corporation and he's not in the control group, then you've got to produce it. That doesn't make any sense. The purpose of the attorney-client privilege is the frank exchange with the idea that it's going to be used in your defense, just like Mr. Rata mentioned in his affidavit. In this particular case, we know James Rata was a named defendant. Therefore, that corporate control exception applies. What about Kimberly Hughes? What about the other one? She wasn't named as a defendant. She was not named as a defendant. The question is, under the goal minus cases, you don't have to be literally named as a defendant. They look at, under the Lauer decision, what you look at is, are you named a defendant, or could you, at the time that you gave the statement, be named as a defendant? Let's face it, Judge, when you give a statement to someone after you've had the advice or direction of an attorney, the lawsuit isn't going to be filed that night. It's not going to happen. Common sense would say that, no, is there a potential at that particular time? And at that particular time, there was a potential for James Rata being sued and for Kimberly Hughes being sued. She wasn't sued, but that doesn't matter because she could have been sued. Why? She also rendered medical treatment at the scene of the accident. So the other second problem, so when we're looking at the first factor, it's incompetence. We look at who stated, are you within a control group or not? We're saying there's an exception. The second factor is it may be incompetence, but the idea won't be disclosed. Well, the affidavits we have from Dr. Smith, Mr. Locke, the executive director, and James Rata, the driver, basically said, yeah, it was made incompetence. They asked the attorney for advice. James Rata stated, but it was his understanding, I'm going to make the statement, and it's going to be used to defend me. He had a reasonable expectation that it would not be disclosed, and accordingly we believe that it should be privileged. And we think the court was wrong in holding that simply because Rata was not in the control group. It has to be produced. Factor number two. Factor number two is you have to make it to the attorney acting in his legal capacity for purposes of securing advice. Well, read literally, you have to make it to the attorney. Well, not truly. You don't have to make it to the attorney directly. The trial court, however, found that it did. The trial court held that there was no privilege because the statements were not given directly to Mr. Hutchins, the attorney who said he'd get these statements, nor used by him, although they were used by, what, not the corporate counsel, the insurance defense counsel who was retained. There is no requirement that they invoke the attorney-client privilege. You have to speak directly to the attorney. We all know that from the cases such as People v. Ryan, a Supreme Court case, one of the earlier cases that says, hey, listen, if I get in a car accident and I talk to the insurance company's adjuster, that's both with privilege. I'm never talking to an attorney. In fact, in the lower decision, Lauer, if you want to pronounce it that way, they talked to a third party, and that was even before the attorney was retained. So the point is, literally, we have to talk to the attorney. No, you do not. I think the court erred in holding that you had to. Dr. Smith and Mr. Locke asked for legal advice from the attorney, and they got it. Now, I guess we could sit here and debate, well, will it depend, will the privilege depend on what type of legal advice? I don't think so. When you're involved in an automobile accident and somebody dies and you're concerned that there may be some liability, you're going to ask for advice from the attorney. If he says, I want you to write down a statement, I think you're going to write down that statement. Does it make any difference that Golminas predated consolidation coal by about 13, 14 years? No, not once in a while. Why not? It's interesting. The Cox decision and the consolidation coal decision all relied on the same elements. Golminas kind of predicted. They talked about the control group in that case. So did consolidation coal. So did Cox. The fact that it predated it had no bearing. It wasn't overruled. It wasn't overruled. The Supreme Court didn't need to address that situation because it wasn't presented. For example, in consolidation coal, I believe that was produced a report of a mining engineer. Objective data, a little bit different than here. But the fact that it was predated does nothing. It's good case law. It's out there. Now, to be blunt, it's what? Another district's decision. This panel could say, well, I don't care what the other district in Chicago or Cook County or third district says, but we believe the rationale makes sense. Why should you weigh the privilege simply because you're employed at a time you end up being sued in any event, or could end up being sued? Now, the plaintiffs rely on a line of cases, rounds and congealed seating, or I'm not sure how you pronounce it, dealing with where nurses gave statements, and they said, well, that's a normal course of routine when you gave these statements on a medical malpractice case. They're not privileged. Well, the key in that particular, those particular cases, and what I'm trying to emphasize here is they went out, in this case, we went out and sought, the employees sought legal advice. That is, Dr. Smith and the director said, let's talk to our corporate attorney. That's the critical thing. Now, that ties in with another finding by the trial court. The trial court gave a reason that it's no privilege because these statements were made as a matter of course in routine business. And, Judge Watson, that kind of ties in with your question. If I, your point, I'll take it a little, I'll take it a step further. What the court found was that in this normal event that's unrefuted, by the way, there are no counter affidavits filed, no request by the plaintiff that would need more discovery on these issues. The affidavits stand unrefuted. What the court said is this is simply a matter of a normal reporting requirement for the annual service. And that's why at the hearing we said, well, if you want to look at the in-camera inspection, you may find that's a little bit different. But more importantly is it was explained to the court, and by the way, as background, we produced, as requested, sample incident reports from the ambulance. So if the ambulance backed into a telephone pole or something of that nature, they would do typical incident reports. You don't call an attorney and say, hey, my car rolled into a telephone pole or I didn't take the emergency brake off and I have a problem. None of those reports, as set forth in discovery, supplemental and derogatory number four answers, dealt with consulting an attorney. Backing it into a pole is a little bit different than getting involved in a collision where somebody dies. But the point being is that they did not involve a consultation with an attorney. More importantly is, in this particular case, what happened? Mr. Jeffrey got these statements, put them in a separate file mark, Illinois incident report, put them in his office. Or if he had these typical incident reports, you don't call them and say, what should I do, I need an attorney. They would just fill out these incident reports and they would stick them in a personnel file. It wasn't done in this particular case. The third factor and the last factor is the idea that these statements that arise in confidence, directed by an attorney for advice, third factor is they have to remain confidential. In this particular case, the Illinois incident reports remained confidential. They were in Mr. Jeffrey's office. Now, the plaintiff claims, well, no, they didn't remain confidential because these two statements found their way into Kimberly Hughes' paper personnel file for timing. That's true. They were there. But while they were there, only Mr. Locke and Mr. Wright had access to them. This wasn't something that was produced to everybody at the Ambulance Service or produced to everybody in the world. It was still limited. These individuals, if anything, were the agents of the attorney in securing the statements. They were returned to Mr. Jeffrey's file. So we believe that they did remain confidential and there was no waiver. Was the trial court aware that they did not remain confidential and given an explanation why that wouldn't matter? No. Judge, my recollection is the trial court didn't really address that issue in its particular findings. Is it in the record that the trial judge knew it, though, whether the judge addressed it or not? I think it would be, Your Honor, because I think that information is contained in the answers to discovery, what happened. And you'll see, and I just point out, I pick on the supplemental interrogatories because they were very detailed in their verified answers. Thank you, Counsel. Thank you. Counsel? Good morning. May it please the Court. Counsel, my name is Bob Black. I represent the plaintiff in this matter. There are certain things we know about this case. One is we have this terrible fatal accident, October 8, 2007, involving the minor, Brett McDaniel, and involving the ambulance driver, Mr. Ratta, and Ms. Hughes, who was also in the ambulance. We know that later that evening, Dr. Smith was contacted, who was the Mercy Medical Director, and he contacted Attorney Hutchins. Attorney Hutchins is corporate counsel for Mercy. And Mr. Locke, the Executive Director at Mercy, also contacted Mr. Hutchins, again, the corporate attorney for Mercy. And basically what Mr. Hutchins said, and this is actually directly from what counsel said, Attorney Hutchins said, get written statements by the two employees. That's the extent of it. That's it. So once they returned back from their shift, and once they returned back from giving out the official police reports, their shift supervisor, Mr. Jeffrey, said, okay, you've got to do your written statements here. In the early morning hours of October 9, 2007, they gave their written statements. The written statements were placed by Mr. Jeffrey, again, their shift supervisor, into what he labeled an Illinois incident file. Now, in direct response to some of your questions beforehand, this Illinois incident file was placed in the file there. We don't know who had access to it, who didn't have access to it. We just know it was there. But soon thereafter, within two months, an electronic version of those statements was made or were made. And the statements made it into Ms. Hughes' paper personnel file. We don't have anything in the record here of who does or does not have access to their paper personnel file. But we know that this is fact. This is in the answers to interrogatories. This was before the trial court. And I believe it was argued during the hearing of the motion to compel it before the trial court. So we know those factors are true. And, in fact, as of November 28, 2007 is when that occurred, when there were electronic copies made and then they were placed in the paper file. This lawsuit was filed one year after the incident, October of 2008. The motion to compel came about June 4, 2009. Coincidentally, in June of 2009, these paper reports that were in the paper personnel file for Hughes made it back into the Illinois incident file. Okay. Against this backdrop, we have three basic provisos about discovery in Illinois. Number one, in Illinois, there's a strong public policy of encouraging full disclosure. And, therefore, broad discovery is allowed. Number two, the exception for any type of privilege, including the attorney-client privilege, is a narrow exception. And, number three, to obtain the benefit of the privilege or to claim the privilege, it is the burden of the party that wants the privilege to show that the privilege exists. Okay? Now, against that backdrop, we have- Let me ask you a question about that. Do you think that there's any relevance to the fact that the attorney who told the doctor to get the statements is not the attorney that represents the parties? I think that's of extreme relevance. Not only did the attorney, who was a corporate attorney, say, just get the written statements of the employees and didn't offer anything else, but he was never involved in any consultation in this manner towards the defense of these individuals or the potential defense of these individuals. In fact, he is corporate counsel. Different counsel came on board later that was retained, and I think that is a huge difference there. And, therefore, respectfully, I disagree with counsel on that. Is that because they are employees of Mercy? Or were they employees of Mercy? I don't even know if they were independent. The record, as I understand it, shows that the ambulance driver, Red, and Hughes, who was also in the ambulance, were employees of the ambulance service, which was part of Mercy. Part of Mercy. That's my understanding. I'm incorrect, but that's my understanding. Mercy is a named defendant. Yes. Mercy is a named defendant. Mr. Red is a named defendant. And he represented Mercy, the attorney that advised to get the statement. I'm sorry, what? And he represented, he is the counsel for the named defendant, Mercy. He is who? The one that said get the statement. No. Hutchins is their corporate counsel for Mercy. Oh, corporate counsel. Okay, thank you. He has never represented Mercy in this manner. He has never filed an appearance for Mercy in this manner. He has never been involved in this litigation. So against that backdrop, and these essential things that we have to recognize, and against the facts as we know them from the record, we have the series of cases that we've cited, the Rounds case, the Cangellosi case, and the Sakowski case. And what those talk about, and counsel did identify for you the three elements, but I'd like to talk about them too. The first element, that the statement originated in confidence that it would not be disclosed. The second element, that it was made to an attorney acting in his legal capacity for the purpose of securing legal advice. And third, that it remained confidential. Well, the problem here, the first problem here, and the problem that the trial court identified, is these statements weren't made to an attorney. They certainly weren't made to an attorney acting in his legal capacity. And they certainly weren't for the purpose of securing legal advice. Because all the attorney, the corporate counsel, who's never appeared, Mr. Hutchins, said is make sure you get the written statements of the employees. That's it. Okay? The trial court recognized that, commented upon that, commented upon the lack of active involvement by an attorney in this advice to just get the written statements. Parenthetically, Mercy has done this procedure with other types of incidents. Every time there's an incident, you write the written statement, you write the written report, you have the employee do that. We don't know if there is or is not any difference there, but the fact of the matter is, this is done as a matter of course. Within Mercy's hierarchy. And the trial court commented upon that. Okay. The, whether the statement originated in confidence, it would not be disclosed. We do have, you know, the self-serving, I must state, affidavit by Mr. Retta that I presumed that it would not be disclosed. But the fact is, this was just coming back, file out, fill out the report, here's the report. There's nothing here that shows it's beyond anything more than a factual recitation of what happened. There's nothing that shows it's anything that involves any sort of legal advice, advice of counsel, anything like that. It is a factual statement. From all, for all intents and purposes and for everything we can see here. Now, did it remain confidential? From the record, it did not. I don't know if placing it in a mere file that says Illinois incident file in somebody's file cabinet, whether it's locked or unlocked, who has access to it, who doesn't have access to it, is enough to begin with. And I submit that is the burden of the defendants to show whether that is enough to begin with. But we also know from the answers to the interrogatory that that's not where they remained. They were placed in a paper personnel file. They were electronic copies made. We know that from the answers to the interrogatory. Is that mercy the defendants themselves provide? Am I correct that in Rounds, Pangolosi, and Sekowsko, no attorney told them to make the statement? They just did it on their own? That is absolutely correct, Your Honor. That is, in Rounds, it was a nurse that said, you know what? Something happened here tonight. I may be a defendant. I may be a part of this litigation. I'm going to write a written statement. The same thing occurred in Pangolosi. We do not have the interjection of an attorney that we do here that basically was called and said, make the written report. So then wouldn't that distinguish those three cases that you strongly rely upon? No, I don't believe so, Your Honor, for the mere fact that what those cases do talk about is that those issues, those concerns were, all right, I've just been part of this incident. I may be a defendant. I may need to be defended here by my employer, by my employer's counsel. I want a fresh recollection of what's going on, so I'm going to make these statements. And there's no indication that those statements in Rounds and in Pangolosi are anything more than what we have here in terms of a factual recitation as opposed to something that involves the advice of counsel. And let's step back for a second and recognize that, yes, the attorney-client privilege is very important and it's very significant, and it has a definite purpose. The purpose here is not actuated by, all right, give the statement. The purpose behind the attorney-client privilege would be actuated by, all right, the attorney is involved here. What happened? I'm going to talk to you about what happened. You're going to talk to me about what happened. I'm going to write something down. You're going to write something down that you're going to provide to me. There should be more involvement than that. Other than merely stating, corporate counsel over here stating, make sure you get the written statements, and there's no indication here that this is any different from when there was any other incident report, albeit obviously with the gravity of the situation and the circumstances, there certainly was a bit more of an indication that this may become litigation at some point. Certainly it was a significant incident. But the defendant wants to rely upon is the Boninas case, and the little thing that's carved out from Boninas and then is relied upon, they also rely upon the either lower or lower case. I'm not sure, counsel, how do we pronounce that? What your office didn't correctly recognize is that Boninas predated consolidated coal or coal consolidated. I might be juxtaposing names there. And it had a whole, it's a whole different world back then when that case was decided. Now, granted, it hasn't been overruled. It still is. But it was decided in a whole different world. What happened in Boninas is this was pretty much the initiation of what is a control group in Illinois and what is not a control group in Illinois. Control group here is not an issue. Defendants have conceded that. They've talked about that. There's no question but that neither the ambulance driver nor his shift supervisor were part of the control group. But what Boninas said was, all right, these people, you know, this is what, they decided the case on the control group issue. Then what I have to say is that's not to say that a person, a corporate defendant who was also a defendant or a person who may be charged with liability might not have the privilege available where this statement is given to or directed at an attorney. So number one, Boninas is sitting out there a little older. Number two, Boninas talks about this thing that they want to wedge upon and dig them. And number three, you still have the element, statement given to or directed at an attorney. Nothing here indicates it was ever given to or directed at an attorney. It is, and again I'm going to use these words, get a written attorney saying, get a written statement of these two employees. Corporate counsel has never appeared. The lower case which cites the Ryan case talks about something completely different. There it talks about communications between an insurer and an insurer where the insurer is under a duty to defend. And now it talks about the contractual obligation under an insurance policy, under a typical comprehensive liability policy to, on the one hand, for the insurer to provide the defense indemnity, and on the other hand for the insured to cooperate. There is a contractual responsibility here that is not at play in our case. Now we talk about how the fact that, you know, as it turns out, Mr. Ratta is being represented by the same counsel as Mercy, and apparently it's Mercy's insurance company. And we have the affidavit that was referred to by Mr. Locke, who's the executive director. That appears at page C145 of the record. I do want to note what Mr. Locke states in his final paragraph of his affidavit. Now, I believe that these cases with insured and insurer and this heightened contractual responsibility don't apply here. Well, Mimas does not apply. Lover doesn't apply. Ryan doesn't apply. But this is what this affidavit says, and it says, Mercy provides insurance coverage for employees for their work-related activities and has the option of identifying all employees for work-related litigation and costs and judgments in the event there is no insurance coverage for the ill-ex-alleged in the litigation resulting in the judgment. The fact that it says there's an option here, even if this court were to try and say that, okay, these cases with the insurance company liability and the insurance company responsibility somehow fit this setting, even though we don't have this mutual contractual responsibility, here their own executive director is saying, well, we have the option. It doesn't say we have to. It doesn't say we're going to. We have the option. The additional language, in the event there is no insurance coverage for the ill-ex-alleged in the litigation resulting in the judgment, I'm not sure how that plays it here or how that fits in, but it seems to me some sort of further option upon an option or further condition upon a condition. So this case does not fit within those contractual insurance company cases. This case does not fit within Gominis, where Gominis basically talks about dicta. And we do know, we do know that there have been cases since then talking about an employee who is not within the control group and whether or not they do or do not have coverage, where they're going to be the subject or potentially the subject of litigation. And those cases are Rounds and Cangellosi and Sikowsky. And those cases are decided based upon those facts involving, it's not just a matter of because this corporate employee was an employee, then if he gives a statement to us that it's entitled to protection, there still has to be more. And that is what the trial court so succinctly found, that there still has to be more. There has to be other elements as they have developed. And in the Rounds case and in the Cangellosi case, the Rounds being, I want to say 1999 perhaps, Cangellosi being 2005 or 2006, with the benefit of the Supreme Court case law since, Gominis has got to originate in confidence, it's got to be made to an attorney who is acting in his legal capacity for the purpose of obtaining legal advice, and it has to remain confidential. Obviously we disagree, counsel and I, on how those elements interplay, but I would say, I think the trial court found correctly, that that second element is what is most missing here. All we have is a phone call to an attorney that says, make sure you take the written statements. He didn't become involved after that. When attorney, I've drawn a blank on his name, Van, thank you very much, became involved with Iran and retained the defense counsel. He then asked for those. But he didn't have any involvement in their preparation. He didn't have anything to do with their preparation. They'd been prepared long before that. So there was no, that's the crux of this case. There is no attorney involvement. And I understand, and I can accept counsel's position that, you know what, there are times when certain circumstances should fit where a person is possibly subjected, is going to be subjected to potential liability. This isn't the case, however. Not based upon what we have, not based upon what we see of the record, and the fact that what we have is basically, from all we can discern, is primarily a factual recitation. The trial court used the phrase incident report. That's from the discovery that was obtained from the defendant. What they put it in is what is called an elementary incident file. Not in an attorney-client privilege. No, nothing like that, just an elementary incident file. And that was it. And like I said, we don't know if there was a lock on the file cabinet or any sort of protection in ways so that it would remain confidential. We don't know that. And it is the burden of the party claiming the privilege to show us that. Did they have any affidavits from the two people that gave the statements that they were given with the expectation of privacy due to an attorney-client privilege? No. We have Mr. Rada saying, I expect that this would remain confidential. I believe we also have Mr. Jeffrey, who is the shift supervisor. It might be Mr. Locke. I'm not certain, although I do have the Locke affidavit in front of me, and I don't see it there. But nothing about expected to remain confidential and deal with an attorney. In fact, as I look at number three, paragraph number three of the Locke affidavit at C-145, Attorney Hutchins advised us for the need for James Rada and Kimberly Hughes to prepare reports on the occurrence that night, period. Nothing else. So, okay, I see my green light is flashing. I'm almost there. I could talk about Browns and Cangellosi a little bit more in terms of, you know, factually what happened there. And the yellow light's on now. Any further questions I can answer from the panel? I don't believe there are. Thank you, Counsel. Thank you, Your Honors. We would ask then that the motion be compelled, the ruling on the motion be compelled, that the documents be compelled to be affirmed, and that the contempt finding be dealt with quarterly as it needs to be on that one. Thank you, Your Honors. Thank you, Counsel. Counsel? Thank you, Your Honor. I want to address a few points of this waiver. Regarding this waiver, Counsel is right. It's our burden to show that there's an attorney-client privilege involved. We did show that. The affidavits, the answers in the rocketry said that when you place this in this file in Jeffrey's office, who was allowed to go in there? Who had access? Two people, black and white. That's it. Now, if they think everybody in the world is going to come in here and march in, take a look at it, read it or something, then refute the affidavit. It wasn't refuted. Show me something. Ask for a discovery. They didn't ask for any discovery. The fact that the attorney gave the advice to take a statement, was a corporate attorney, means nothing as far as compared to that he wasn't a defense attorney. Third, you will not see any case law cited by the plaintiff that says, When a corporate attorney gives legal advice to a corporate employee, that doesn't count. It doesn't count because he's a corporate attorney and the insurance company is going to hire an insurance defense attorney. That just has no merit whatsoever. As we know from our daily, day-to-day experiences in the Ryan case, you don't even need an attorney. Heck, an insurance company can say an ingestor can come out after the scene of an accident, talk to the insured and get it without even an attorney being retained. It happens all the time. So, there's no requirement that you have to directly. Their key is, boy, he told them to give a statement and they gave a statement, but they never talked to the attorney. The corporate attorney never used it. That's a distinction without absolutely any merit. Their key point seems to be that all this attorney said was, write it down, write it down. Well, guess what? That's called legal advice. If I'm involved in an accident and there's a death and I give legal advice and I say to the individual contacts, me, the employee, I say, I want a statement and it happens all the time in my world. Write it down. Let's get all the specific facts. That's legal advice. That's consultation with an attorney. Now, I'm just kind of confused where the judge said, well, this is no different than an incident report. There was no in-camera inspection. It was there. If you read the transcripts, it's pointed out that typical incident reports are where the individual employee signs it, sticks it, and it's put in his personnel file and that's it. It didn't happen in this particular case. The fact that Goldenhurst was a predated Consolidate judge, Goldenhurst, you mentioned that before, counsel, I think the quote was, it was a whole different world at that time. No, it wasn't. They talked about corporate control group. They talked about all that. Consolidate talked about the same thing. They didn't have to deal with the exception. So it was a whole different world. Finally, this is common about there is no contractual relationship, et cetera. The discovery, the answers in the derogatory shows that the employees were insured under the policy of mercy. They were insured. It doesn't take a rocket scientist to figure out that they're being defended by an insurance attorney. Because why? Because they aren't covered. That's nothing unusual. I would say the majority of cases, if not all of these, when you have an employee working for an employer, what's the employer going to do? He's going to have him as an additional insured or a named insured under that, especially in the business world. Nothing unusual about that. Well, then, Plano's mentioned, well, hold it. If you look at the affidavit a lot, it says the option to indemnify. Well, guess what? If you read any insurance policy, there's always an option. That is, if you go out to your next-door neighbor, take a gun, point it at his head, and pull the trigger, there may be no coverage. There's always an option. You don't indemnify. You have a duty to defend. There may not be any duty to indemnify. That depends. But that has nothing to do with the obligation. And more importantly, forget about the hypothetical, the fact that they're actually defended. Bottom line is these individuals gave statements following the death of a child at the advice of the attorney. And, in fact, James Rattle was named as a defendant. And if you believe goal minus is wrong, then say so. If you believe goal minus is correctly decided, like I believe it is, then I think the trial court's decision is wrong and the order of contempt should be vacated. And then as an aside, regardless, we did this in good faith. This isn't a situation where we call the judge, you know. I don't think that's really an issue. The award of attorney's fees and fines, even if it's affirmed, I don't think those should be vacated. Thank you, Your Honor. Thank you, Counsel. We appreciate the briefs and arguments of both counsel. We'll take the case under advisement. The court will be in a short recess.